**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1989**

GARY KIRK,

Plaintiff - Appellee,

v.

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Donald C. Coggins, Jr., District Judge.  (0:17-cv-02189-DCC)

**No. 19-2028**

LARRY KERMIT TAYLOR,

Plaintiff - Appellant,

v.

ANDREW SAUL, Commissioner of Social Security,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon.  Pamela Meade Sargent, Magistrate Judge.  (1:16-cv-00044-PMS)

Argued:  October 26, 2020                          Decided:  February 4, 2021

---

Before WYNN, HARRIS, and QUATTLEBAUM, Circuit Judges.

---

19-1989 affirmed, and 19-2028 reversed by published opinion.  Judge Wynn wrote the opinion, in which Judge Harris joined.  Judge Quattlebaum wrote a dissenting opinion.

---

**ARGUED:**  Thomas Gary Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant Commissioner of Social Security Administration and Appellee Andrew Saul.  Alexandra Tucker Stewart, WILMERHALE LLP, Washington, D.C., for Appellee Gary Kirk and Appellant Gary Taylor.  **ON BRIEF:**  Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; A. Lance Crick, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellant Commissioner of Social Security and Appellee Andrew Saul.  Ned Barry Pillersdorf, PILLERSDORF, DEROSSETT & LANE, Prestonburg, Kentucky; John M. Leiter, LAW OFFICES OF JOHN M. LEITER, PA, Myrtle Beach, South Carolina; Wolodymyr Cybriwsky, Prestonburg, Kentucky, for Appellee Gary Kirk.  Daniel S. Volchok, Aprit K. Garg, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellee Gary Kirk and Appellant Larry Taylor.

---

WYNN, Circuit Judge:

Plaintiffs Gary Kirk and Larry Taylor are former recipients of Social Security disability benefits and former clients of Eric Conn, an attorney who orchestrated one of the largest fraud schemes in the history of the Social Security Administration ("SSA").

In 2015, SSA redetermined the benefits eligibility of 1,787 individuals formerly represented by Conn—including Plaintiffs—based on its suspicion that their disability determinations were rooted in fraudulent evidence submitted by Conn. Upon redetermination, SSA terminated the benefits of nearly half of those individuals, including Plaintiffs, after finding them not to be disabled.

In these consolidated appeals, Plaintiffs argue that SSA's categorical exclusion of allegedly fraudulent medical evidence during the redetermination process was unlawful because they were never afforded any opportunity to rebut the allegation that their evidence was tainted by fraud. The two other circuits that have considered substantially similar challenges each concluded that SSA's redetermination procedures are unlawful.[1]

---

[1] *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 813 (6th Cir. 2018), *reh'g en banc denied*, No. 17-5206, 2019 U.S. App. LEXIS 9472, at *4 (6th Cir. Mar. 29, 2019); *Jaxson v. Saul*, 970 F.3d 775, 778 (7th Cir. 2020) (unanimous decision). Various district courts around the country have likewise held that the challenged SSA procedures are unlawful. *See, e.g.*, *France v. Saul*, 1:17-cv-00465-TDS-JEP (M.D.N.C. Dec. 31, 2019); *Agosto v. Comm'r of Soc. Sec.*, 3:18-cv-01271-MEL, 2019 WL 6190612, at *5–6 (D.P.R. Nov. 20, 2019); *Tyler J. v. Saul*, No. 17 CV 50090, 2019 WL 3716817, at *15 (N.D. Ill. Aug. 7, 2019), *aff'd sub nom. Jaxson v. Saul*, 970 F.3d 775; *Kirk v. Berryhill*, 388 F. Supp. 3d 652, 662 (D.S.C. 2019); *Hicks v. Colvin*, 214 F. Supp. 3d 627, 646 (E.D. Ky. 2016), *order corrected on other grounds sub nom. Hicks v. Berryhill*, No. CV 16-154-ART, 2017 WL 1227929 (E.D. Ky. Mar. 31, 2017), *and aff'd*, 909 F.3d 786.

For the reasons set forth below, we agree with our sister circuits and therefore hold that SSA's redetermination procedures violate the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment.[2]

I.

Kirk and Taylor applied for Social Security disability benefits in November 2008 and July 2010, respectively.[3] When their initial applications were denied, they each hired Conn, a Social Security disability attorney, and sought reconsideration of their claims and, subsequently, review by an Administrative Law Judge ("ALJ"). In preparation for the ALJ's review, Conn arranged for Kirk to be medically examined by Dr. Frederic Huffnagle and for Taylor to be seen by Dr. Srinivas Ammisetty. Soon afterward, ALJ David Daugherty reviewed each Plaintiff's claim and issued fully favorable decisions on the record (*i.e.*, without holding a hearing) in both cases, finding Plaintiffs disabled and granting them benefits.

Kirk and Taylor received their benefits for years. But in May 2015, SSA notified them that it would be redetermining their eligibility for benefits. As it turned out, Conn had

---

[2] While the Sixth Circuit's holding was similarly based on the Due Process Clause and the APA, *see Hicks*, 909 F.3d at 813, the Seventh Circuit decided its case based on "ordinary norms of administrative law," *Jaxson*, 970 F.3d at 778.

[3] SSA administers two disability benefits programs. The Social Security Disability Insurance Program ("SSDI") "provides benefits to disabled persons who have contributed to the program while employed." *Craig v. Chater*, 76 F.3d 585, 589 n.1 (4th Cir. 1996). The Supplemental Security Income Program ("SSI") provides need-based financial assistance to aged, blind, and disabled persons who have limited income and resources. Kirk applied for both SSDI and SSI benefits. Taylor applied for SSDI benefits only.

planned and executed one of the largest fraud schemes in SSA history, costing the agency over $550 million.

Conn's scheme was simple. He would arrange for a client to be seen by one of four hand-picked doctors, including Drs. Huffnagle and Ammisetty. He would then provide the doctor with a pre-completed template form describing the client's Residual Functional Capacity.[4] The doctor would sign the form without changes, and Conn would submit it to SSA in support of his client's application. Then, ALJ Daugherty—whom Conn was bribing—would flag the case, assign it to himself, and swiftly issue a favorable decision without a hearing. Notably, SSA has never alleged that Plaintiffs knew anything about the fraud that triggered their redeterminations.

Although SSA had become aware of "possible wrongdoing involving [ALJ] Daugherty and Conn as far back as 2006," it took no action for years. *Hicks*, 909 F.3d at 793. But finally, in May 2015, SSA notified 1,787 of Conn's former clients—including Plaintiffs—that it would redetermine their eligibility for benefits because its Office of the Inspector General had "reason to believe" that fraud was involved in their applications for benefits. J.A. 73, 106–07, 270–71.[5] In particular, the Office of the Inspector General

---

[4] In determining whether a claimant is disabled, SSA relies on Residual Functional Capacity assessments to evaluate whether the claimant can perform "past relevant work" or, alternatively, "adjust to any other work that exists in the national economy." 20 C.F.R. § 404.1545(a)(5).

[5] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

5

suspected that Conn had submitted pre-completed and fraudulent Residual Functional Capacity forms in support of those individuals' applications.

Under the Social Security Act, SSA must "immediately redetermine the entitlement of individuals to monthly insurance benefits . . . if there is reason to believe that fraud" was involved in their applications. 42 U.S.C. § 405(u)(1)(A). And "[w]hen redetermining the entitlement," the agency must "disregard any evidence if there is reason to believe that fraud . . . was involved in the providing of such evidence." *Id.* § 405(u)(1)(B).

Accordingly, the redetermination notices sent to the 1,787 beneficiaries explained that SSA would be disregarding "any evidence from [any] of the [four] medical providers" associated with Conn's fraud if the evidence was submitted by Conn. *See, e.g.*, J.A. 106, 270. For Plaintiffs, that meant SSA would not consider *any* evidence in their records from Dr. Huffnagle or Dr. Ammisetty, even though the Office of the Inspector General suspected only that the *Residual Functional Capacity forms* completed by those doctors were tainted by fraud.[6]

---

[6] Though the dissenting opinion suggests that the Residual Functional Capacity forms were the only evidence excluded by SSA, *see, e.g.*, Dissenting Op. at 28, 31, 38–41, 48, the record instead indicates that SSA also excluded all other evidence from the four doctors associated with Conn. *See* J.A. 107, 271 ("By law, we [SSA] were not able to consider evidence from: Bradley Adkins, Ph.D., dated between July 2007 and May 2011; Srinivas Ammisetty, M.D., dated after July 2007; Frederic Huffnagle, M.D., dated between January 2007 and May 2011; or David P. Herr, D.O., dated between December 2009 and April 2011."); *see also Hicks*, 909 F.3d at 801 ("The OIG referral stated only that the OIG had reason to believe that a small portion of the four physicians' reports—the RFC forms— had been fraudulently prepared, . . . yet the SSA disregarded *any* evidence signed by Adkins, Ammisetty, Huffnagle, or Herr and submitted by the Conn Law Firm between January 2007 and May 2011 . . . . The SSA's rule therefore excludes a wide range of materials that the OIG never claimed to have 'a reason to believe' were tainted by fraud.").

6

The redetermination notices further stated that SSA's Appeals Council had conducted a preliminary review of each of their cases to see if the other, non-disregarded evidence in the record supported a finding of disability. But because the record did not support such a finding, the agency opted to "set aside the favorable decision[s]" and send each case "back to a different [ALJ] for more action and a new decision." J.A. 107, 271.

At Plaintiffs' redetermination hearings in 2016, the ALJs did not consider any evidence produced by Dr. Huffnagle or Dr. Ammisetty. Additionally, Plaintiffs were not permitted to challenge the Office of the Inspector General's reason-to-believe determinations that triggered the categorical exclusion of such evidence. The ALJs did consider all other evidence relating to the relevant period, including new, additional evidence submitted by Plaintiffs.

Shortly afterward, both Plaintiffs received unfavorable decisions. In both cases, the ALJs concluded that "there was insufficient evidence" to support "a finding of disability" as of the dates of Plaintiffs' original favorable decisions. J.A. 66, 233. Accordingly, the ALJs ordered that Plaintiffs' benefits be terminated and further concluded that SSA "may treat any benefits previously received as an overpayment." *Id*.

Plaintiffs appealed the ALJs' decisions, but the Appeals Council denied review. Having exhausted their administrative remedies, they each filed suit in federal district court, raising several statutory and constitutional claims. But the core contention below— as here—was that SSA should have afforded Plaintiffs an opportunity to challenge the fraud allegations that led to the exclusion of evidence during the redetermination process.

7

In Kirk's case, the district court held that "SSA's redetermination process violates the minimal requirements of due process" because it categorically excludes potentially critical evidence based on fraud allegations that beneficiaries cannot challenge. *Kirk v. Berryhill*, 388 F. Supp. 3d 652, 662, 664–65 (D.S.C. 2019). SSA timely appealed that decision.

In contrast, a different district court ruled against Taylor, rejecting his claims that SSA's redetermination procedures "violated his due process rights, the Social Security Act or regulations and the APA." *Taylor v. Berryhill*, No. 1:16cv00044, 2018 WL 1003755, at *22 (W.D. Va. Feb. 21, 2018). Taylor timely appealed. On Plaintiffs' unopposed motions, we consolidated their cases for purposes of this appeal.[7]

II.

We review legal issues, including claims of APA or due process violations, *de novo*. *See Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (APA); *United States v. Shealey*, 641 F.3d 627, 633 (4th Cir. 2011) (due process).

---

[7] Plaintiffs also raise an Appointments Clause challenge, arguing that they are entitled to new redetermination hearings because the ALJs who terminated their benefits were not properly appointed. We recently held that Social Security claimants may raise such challenges in the first instance in federal court (as Plaintiffs did here). *See Probst v. Saul*, 980 F.3d 1015, 1018 (4th Cir. 2020). And *Probst* establishes that the Appointments Clause entitles Plaintiffs to new redetermination hearings before different ALJs. *Id.* at 1025. Nevertheless, a new redetermination hearing alone will not address the issues raised in this case if the agency continues to use the same redetermination procedures objected to here. Accordingly, we reach Plaintiffs' statutory and due process arguments and resolve their cases on those bases.

8

III.

Plaintiffs argue that SSA's redetermination procedures violate the Administrative Procedure Act. They contend that it is arbitrary and capricious for the agency to deny beneficiaries an opportunity to contest the Office of the Inspector General's fraud allegations as to their cases, while permitting other similarly situated beneficiaries to challenge similar allegations arising from SSA's own investigations. We agree.[8]

Under the APA, courts must "set aside agency action[s], findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Plaintiffs argue that SSA violates this prohibition on arbitrariness and capriciousness by employing redetermination procedures that differ depending on the origin of the underlying fraud allegation.

Specifically, when SSA develops a "reason to believe" that fraud was involved in a particular application based on a referral from the Office of the Inspector General—as was the case for Plaintiffs—"adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded." SSA Hearings, Appeals, and Litigation Law Manual § I-1-3-25(C)(4)(a). Rather, the evidence must be excluded automatically. In contrast, when an allegation of fraud arises from SSA's *own*

---

[8] Plaintiffs also contend that redetermination hearings are "formal adjudications" under the APA, and that SSA failed to provide several of the procedural protections required for such adjudications. We need not reach this argument. *But see Hicks*, 909 F.3d at 804–09 (holding that SSA's redetermination procedures "violated the APA's formal-adjudication requirements," in addition to the "prohibition on 'arbitrary' or 'capricious' decisionmaking").

investigations, "an adjudicator *can* consider a beneficiary's . . . objection to the disregarding of certain evidence." *Id.* (emphasis added).

"A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Indeed, a federal agency "can be said to be at its most arbitrary" when it "treat[s] similar situations dissimilarly." *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983). SSA's procedures preclude certain beneficiaries subject to redetermination from contesting the underlying fraud allegations while permitting others to do so. This differential treatment is arbitrary and capricious in violation of the APA.

SSA primarily argues that beneficiaries subject to redetermination based on the Office of the Inspector General's fraud allegations and those subject to redetermination based on SSA's own fraud investigations are not, in fact, similarly situated. Yet, as Plaintiffs correctly point out, this argument is an inappropriate post-hoc rationalization. Indeed, none of the rationales now offered by SSA to explain the aforesaid variance in redetermination procedures appear in either the SSA Hearings, Appeals, and Litigation Law Manual or the administrative record before us, and for that reason, we may not consider them. *See Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld."); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)

("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action."); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015))); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").[9]

Moreover, we agree with the Sixth Circuit that "even if we were to credit the SSA's post-hoc explanations . . . , its purported justifications are insufficient." *Hicks*, 909 F.3d at 808. "All of the SSA's rationales for distinguishing between claimants whose files were deemed fraudulent by the [Office of the Inspector General] and claimants whose files were deemed fraudulent by SSA turn on differences between the [Office of the Inspector General] and the SSA—not between the claimants." *Id.* Under these circumstances, as we describe below, it is not only arbitrary and capricious, but also fundamentally unfair, for SSA to "distinguish between similarly situated claimants based on circumstances entirely outside their control." *Id.*

Whether a beneficiary subject to redetermination is afforded an opportunity to rebut the underlying fraud allegation depends on the pure chance of which branch of the agency first raised the allegation formally. For instance, while it was SSA—not the Office of the

---

[9] "[T]he contemporaneous explanation requirement" applies to both agency adjudications and rulemakings. *Dep't of Homeland Sec.*, 140 S. Ct. at 1909 n.3.

11

Inspector General—that "first learned about possible wrongdoing involving [ALJ] Daugherty and Conn" back in 2006, *id.* at 793, the redeterminations of Plaintiffs' cases were ultimately precipitated by the Office of the Inspector General's reason-to-believe findings. Had Plaintiffs' cases been redetermined based on SSA's initial suspicion of fraud, they would have had the opportunity to contest that finding.

Regardless of whether a fraud allegation is made by the Office of the Inspector General or SSA, its effect on the beneficiary is the same. The allegation will generally trigger not only a redetermination of the beneficiary's eligibility for benefits, but also the probable exclusion of potentially important (and non-fraudulent) evidence during the redetermination process. And—as was the case for Plaintiffs and hundreds of others—it could lead to termination of benefits, which may cause the beneficiary to lose an essential means of livelihood. SSA has provided no good reason why some beneficiaries should be entitled to challenge the agency's fraud allegations while others similarly situated are not. Under these circumstances, treating similarly situated beneficiaries differently based solely on factors unrelated to the beneficiaries or their claims is the very definition of arbitrary and capricious agency action. *Steger*, 717 F.2d at 1406.

For the foregoing reasons, we hold that SSA's redetermination procedures are arbitrary and capricious in violation of the APA.

IV.

But that conclusion does not end our inquiry. In accordance with the "prudential rule of avoiding constitutional questions," we have considered Plaintiffs' APA claim first.

12

*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993).[10] We nevertheless deem it necessary to reach Plaintiffs' due process argument because our APA holding alone does not fully address the issue before us: whether SSA is legally obligated to provide Plaintiffs an opportunity to rebut the agency's fraud allegations at their hearings on remand.[11]

Plaintiffs argue that SSA's redetermination procedures violated their due process rights under the Fifth Amendment because they were denied the opportunity to contest the Office of the Inspector General's fraud allegations against them. We agree. Based on our analysis and balancing of the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976),

---

[10] *See also Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981))).

[11] Theoretically, SSA could rectify the problem of arbitrariness and capriciousness merely by changing its policy to bar *all* challenges to fraud allegations at any type of redetermination hearings. But that is not the relief Plaintiffs seek here. What they request, rather, is a legally protected opportunity to rebut any allegation of fraud. Accordingly, the district court in *Kirk* addressed the constitutional question, holding that due process required SSA to provide such an opportunity and that the agency could not terminate Kirk's benefits except "through a constitutional hearing." *Kirk*, 388 F. Supp. 3d at 663–65. Moreover, this issue was thoroughly briefed by both parties and discussed during the oral argument. Because this case necessarily implicates important questions regarding what constitutes a fundamentally fair hearing, and because the relief ordered by the district court depended on its due process conclusion, we think it prudent to address the issue of due process. *Cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447 (1988) ("Because it appears reasonably likely that the [constitutional] issue was necessary to the decision[] below, we believe that it would be inadvisable to vacate and remand without addressing that issue on the merits.").

we hold that the challenged SSA procedures violate the requirements of the Due Process Clause.[12]

"[T]he interest of an individual in continued receipt of [Social Security disability] benefits is a statutorily created 'property' interest protected by the Fifth Amendment." *Mathews*, 424 U.S. at 332. And "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Under *Mathews*, "a due process challenge is governed by a three-factor balancing test, weighing (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation with the procedures presently used; and (3) the government's interest, including the function involved and the fiscal and administrative burdens associated with additional procedures." *United States v. White*, 927 F.3d 257, 264 (4th Cir.

---

[12] Plaintiffs suggest that we can find in their favor without conducting *Mathews* balancing at all because SSA's redetermination procedures violate a "core" due process right. *Mathews*, they argue, applies only in cases dealing with *additional* process above and beyond a set of core procedural protections. Plaintiffs contend that this case concerns precisely the kind of "minimum due-process protection[] which cannot be balanced away"—specifically, a meaningful opportunity to be heard, which necessarily includes "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." Pls' Principal & Resp. Br. at 16, 20 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality) and collecting other Supreme Court and Fourth Circuit cases). Because *Mathews* is the ordinary test for evaluating procedural due process claims, *D.B. v. Cardall*, 826 F.3d 721, 742 (4th Cir. 2016), and because we conclude that Plaintiffs prevail under that test, we need not and do not address their "core" due process argument here. *But see Hicks*, 909 F.3d at 797 (concluding that SSA's redetermination procedures violated due process under either *Mathews* or a "minimum due-process analysis" (capitalization altered)). Nothing in this opinion, however, should be read as foreclosing similar arguments in the future.

14

2019), *cert. denied*, 140 S. Ct. 2554 (2020); *see also Mathews*, 424 U.S. at 335. We conclude that each factor supports a finding that SSA's redetermination procedures violated Plaintiffs' due process rights.

A.

The first *Mathews* factor is "the private interest affected by the official action." *White*, 927 F.3d at 264. We easily conclude that an individual's private interest in retaining disability benefits is substantial. As the Supreme Court recognized in *Mathews* itself, "the hardship imposed upon the erroneously terminated disability recipient may be significant." 424 U.S. at 342.

By definition, SSDI and SSI recipients are individuals whose disabilities prevent them from engaging in substantial gainful activity, *see* 20 C.F.R. § 404.1505(a), and many of them depend on their benefits to make ends meet. For instance, whereas Taylor had received about $1,779 per month in SSDI payments prior to SSA's redetermination and subsequent termination of his benefits, he received only about $191 per month in SSI benefits afterward. According to Taylor, this nearly 90% reduction in his Social Security benefits left his family unable to pay their bills. Given "the severity of depriving a person of the means of livelihood," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985), one can hardly argue that an individual's interest in avoiding the termination of disability benefits is anything short of extremely weighty.[13]

---

[13] The dissent emphasizes that Plaintiffs do not have any constitutionally protected property interest in avoiding redeterminations or in being able to rebut the fraud allegation. *See* Dissenting Op. at 33–34. While it is true that Plaintiffs do not have such an interest, an

Compounding the gravity of the private interest affected here is the fact that individuals whose disability benefits are terminated via redetermination may be required to repay the benefits already received. And where many years have passed since the initial disability award, a beneficiary could be expected to pay back tens of thousands of dollars.[14] As an example, although SSA ultimately waived overpayment recovery as to Taylor, it initially demanded that he repay more than *$116,000*.

SSA argues that the weight of the private interest is lessened here because beneficiaries can mitigate the effects of benefits termination by requesting waivers of overpayment recovery, filling out new applications for disability benefits, or both. But requests for waivers are just that—*requests*. While SSA has granted 93 percent of the overpayment waiver requests made by former clients of Conn, there is still no guarantee that all or even any of a particular beneficiary's overpayments will be waived.[15] Moreover,

---

opportunity to challenge the agency's fraud allegation is inextricably intertwined with their constitutionally protected interest in the continued receipt of their benefits. Before taking any action adverse to this interest, SSA must afford Plaintiffs (and other similarly situated persons) minimum procedural protections mandated by the Due Process Clause—*one of which*, as we hold today, *is the aforesaid rebuttal opportunity*.

[14] Indeed, the repayment amounts snowballed in large part because SSA failed to take formal action for nearly ten years despite having suspected an unlawful scheme involving Conn and ALJ Daugherty since 2006.

[15] We respectfully disagree with our dissenting colleague's statement that "[w]idespread waiver, not individual debt, is the proper categorical consideration." Dissenting Op. at 35. The waiver of overpayment recovery is merely a *discretionary* form of relief that SSA may or may not provide, rather than *a procedural protection guaranteed to all individuals subject to redetermination*. Thus, in consideration of "the categorical interest"—rather than "any one applicant's personal interest," *see id.* at 34—we believe the availability of the waivers does little to mitigate the adverse effects of benefits termination.

16

as the Sixth Circuit aptly observed in *Hicks*, "there is a distinct dignitary harm to beneficiaries who are not allowed to effectively dispute the allegation that they have been receiving undeserved benefits for close to ten years, leeching government resources to which they had no right. This harm remains even if overpayment is waived." *Hicks*, 909 F.3d at 803.

Nor would a new application for benefits adequately mitigate the harm resulting from termination. For many, if not most, individuals who lose their benefits via fraud-related redeterminations, filing a new application simply could not make them whole, as they would still face the possibility of overpayment and the aforesaid dignitary harms.

Additionally, former beneficiaries filing new applications face significant difficulty in qualifying for SSDI benefits today. Generally, to qualify for SSDI, claimants must prove that they became disabled on or before their "date last insured"—approximately five years after the day they stopped working. *See* 20 C.F.R. § 404.130; Policy Operations Manual System, DI 25501.320, Soc. Sec. Admin. (May 15, 2020), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425501320. Thus, former clients of Conn who lost their benefits via redetermination and who seek to reapply for SSDI bear the onerous burden of proving retrospectively that they were disabled many years ago—the same obstacle they faced during the redetermination process.[16] Notably, about 45 percent

---

[16] Given that the beneficiaries subject to redetermination were those for whom Conn had submitted pre-completed Residual Functional Capacity forms between January 2007 and May 2011, we can infer that those beneficiaries stopped working due to their alleged disabilities around that time.

17

of individuals subject to Conn-related redeterminations (approximately 800 people), including Plaintiffs, lost their benefits because they were unable to prove their past disability without the contemporaneous evidence from Conn's doctors. It is hard to imagine that those individuals would fare any better upon filing new SSDI applications. Indeed, SSA denied Taylor's new SSDI application, finding him not disabled prior to his date last insured of December 31, 2012.

Although individuals who lost their benefits could still apply for and obtain SSI benefits based on their *current* disabilities (as Plaintiffs did), "those benefits are a woefully inadequate substitute for the SSDI payments" that they received prior to redetermination. Pls.' Principal & Resp. Br. at 34. According to SSA's own published data, the average monthly SSDI benefit in December 2020 was $1,142.68, which was *nearly double* the average monthly SSI payment in the same month ($575.73). *Monthly Statistical Snapshot, December 2020*, Soc. Sec. Admin. (Jan. 2021), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/. And this was not an outlier.[17]

---

[17] *See, e.g.*, *Monthly Statistical Snapshot, November 2020*, Soc. Sec. Admin. (Dec. 2020), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2020-11.html; *Monthly Statistical Snapshot, October 2020*, Soc. Sec. Admin. (Nov. 2020), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2020-10.html; *Monthly Statistical Snapshot, September 2020*, Soc. Sec. Admin. (Oct. 2020), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2020-09.html.

For some individuals, this gap could be even wider, as Taylor's case illustrates—*i.e.*, $1,779 per month (SSDI) versus $191 per month (SSI).[18]

In conclusion, the private interest affected by SSA's redetermination procedures weighs heavily against the constitutionality of those procedures.

B.

As to the second *Mathews* factor, Plaintiffs argue that absent an opportunity to contest SSA's fraud allegations, the risk of an erroneous deprivation is unacceptably high. Again, we agree.

As an initial matter, the Supreme Court has indicated that the risk of an erroneous deprivation is too high where an individual is not provided "notice of the factual basis" for a material government finding and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533 (applying *Mathews*). Indeed, the Supreme Court has "consistently observed that these [two safeguards] are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005). Such clear precedent strongly suggests that the challenged redetermination procedures produce an unacceptably high risk of error, given that they fail to provide either of the two aforementioned safeguards.

In addition, the broad scope of SSA's evidence exclusion in the Conn-related cases further heightens the risk of an erroneous deprivation. Though the Office of the Inspector

---

[18] SSA blatantly disregards Taylor's 90% reduction in benefits when it states that Plaintiffs' ability to apply for and obtain SSI benefits "necessarily reduce[d] the harm caused by the discontinuation of" their SSDI benefits. SSA's Resp. & Reply Br. at 13.

19

General stated only that it had reason to believe the pre-completed Residual Functional Capacity forms submitted by Conn were tainted by fraud, SSA chose to disregard *any* medical evidence signed by one of the four doctors associated with Conn and submitted by the Conn Law Firm between January 2007 and May 2011. In other words, the agency excluded a wide range of contemporaneous medical evidence falling outside the scope of the alleged fraud.

Notably, the four doctors associated with Conn submitted not only the Residual Functional Capacity forms, but also "evidence detailing their examinations of [the claimants], including any testing that they had performed and behavioral observations they had made." *Hicks*, 909 F.3d at 795. Indeed, in Taylor's case, the excluded evidence included various medical findings and observations from a physical examination conducted by Dr. Ammisetty, as well as from Dr. Ammisetty's review of a CT scan and laboratory test results from other clinics. We agree with the Sixth Circuit that "[t]he divergence between the material identified by the [Office of the Inspector General] and the material excluded by the SSA highlights the danger of the SSA's approach." *Hicks*, 909 F.3d at 801. "With no adversarial input and no judicial oversight, the risk that nonfraudulent material will be erroneously excluded is impermissibly high." *Id.*

SSA argues that its redetermination procedures provide adequate safeguards against an erroneous deprivation of benefits. Specifically, it emphasizes that (1) on redetermination, ALJs considered all of the evidence in the original case files except for the excluded evidence; (2) Plaintiffs were provided with opportunities to submit additional evidence during the redetermination process, so long as it related to the time of their

20

original applications; and (3) SSA has faithfully carried out its legal obligation under 42 U.S.C. § 423(d)(5)(B) and 20 C.F.R. § 404.1512(b) to help claimants gather relevant medical evidence and develop a comprehensive record.

The availability of these protections, however, does little to mitigate the risk of an erroneous deprivation. As Plaintiffs correctly point out, "it is manifestly no answer to say" that excluding potentially probative, or even critical, evidence "is fine because ALJs can consider *other* evidence." Pls.' Principal & Resp. Br. at 38.

Moreover, as a practical matter, finding other evidence is easier said than done. Old medical records are often difficult, if not impossible, to obtain. Doctors move away; they retire; they destroy old records; they pass away (as Dr. Huffnagle did). Some beneficiaries gave *all* of their medical records to Conn, who later destroyed many of those records. Although the government took possession of the remaining client files when Conn went to prison in 2018, that was well after the initial redetermination hearings had concluded, meaning Conn's former clients did not have access to those documents during their hearings.

Therefore, it is simply unrealistic to expect beneficiaries subject to redetermination to acquire and present new medical evidence showing that they were disabled years ago— with or without SSA's assistance. And for this reason, we deem it fundamentally unfair to preclude individuals in Plaintiffs' position from contesting SSA's categorical exclusion of all medical evidence from the four doctors associated with Conn, since such evidence may well be the only persuasive evidence of their past disability.

21

SSA further contends that even if a beneficiary were to succeed in reintroducing the disregarded evidence, that evidence would be entitled to little, if any, weight when it is inconsistent with the record as a whole. *See* 20 C.F.R. § 404.1527(b), (c)(4). But Plaintiffs rightly urge us not to speculate. "It is impossible to predict . . . what weight an ALJ would assign to medical evidence if reintroduced." Pls.' Principal & Resp. Br. at 40. And even where the excluded evidence would have been accorded little weight upon reintroduction, it could have tipped the balance the other way for beneficiaries who only narrowly failed to meet their burden of proving their past disability.

Finally, we reject SSA's argument that the additional procedure Plaintiffs seek—an opportunity to contest the fraud allegations in their cases—would be of little value. As the Supreme Court has recognized, the "opportunity for [an individual affected by government action] to present his side of the case is . . . *of obvious value* in reaching an accurate decision." *Loudermill*, 470 U.S. at 543 (emphasis added). Here, that opportunity necessarily encompasses a chance to contest the agency's fraud allegations, which are undoubtedly material to the ultimate issue of whether an individual's benefits should be terminated. *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts . . . [that are] relevant to the inquiry at hand."); *cf. Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on

22

questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").[19]

In sum, the second *Mathews* factor also weighs in Plaintiffs' favor.

## C.

Finally, the government's countervailing interests are weak. While SSA certainly has "a substantial interest in preventing . . . fraud and in avoiding erroneously providing benefits," *Ching v. Mayorkas*, 725 F.3d 1149, 1158 (9th Cir. 2013), allowing beneficiaries to contest reason-to-believe findings would only advance that interest by helping the agency accurately determine which evidence is actually tainted by fraud and which is not.

Nor would any potential burdens on the agency—whether financial or administrative—be significant. Contrary to SSA's assertions, there is no need for complex evidentiary hearings or mini-trials here. Rather, a procedure akin to that used by federal courts to resolve a motion *in limine* would suffice—*i.e.*, each side arguing for or against the admissibility of the allegedly fraudulent evidence, either orally or through briefs. *See*

---

[19] Moreover, as the district court in *Hicks* rightly observed, "*Mathews* does not talk about the probability of a victory; it talks about risk of an unfair loss." *Hicks*, 214 F. Supp. 3d at 644. Accordingly, individuals may be entitled to certain *procedural* rights under the Due Process Clause even where the exercise of those rights may not necessarily affect the *substantive* outcome of the relevant proceedings. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring) ("It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.").

*Jaxson*, 970 F.3d at 778 (suggesting the use of this procedure at SSA redetermination hearings).

We also reject SSA's argument that allowing individuals to contest the fraud allegations would frustrate "Congress's objective in providing for swift and efficient redetermination procedures." SSA's Resp. & Reply Br. at 27. Like the Sixth Circuit, we deem this argument unpersuasive, "given that the SSA waited nearly ten years after first learning about possible misconduct involving Conn and [ALJ] Daugherty to initiate redetermination proceedings. It seems disingenuous now to claim that plaintiffs should receive fewer procedural protections because the SSA is statutorily obligated to move quickly." *Hicks*, 909 F.3d at 803.

We further agree with our sister circuit's rejection of SSA's argument that the additional procedure sought by Plaintiffs would infringe upon law-enforcement efforts concerning Conn's fraud conspiracy. *See id.* at 803–04. According to SSA, redetermination hearings that allow challenges to the agency's fraud allegations would likely "rehearse the [criminal] case's merits, including the Government's theory and supporting evidence," thereby interfering with the prosecution of individuals involved in the fraud. SSA's Opening Br. at 42 (alteration in original) (quoting *Kaley v. United States*, 571 U.S. 320, 335 (2014)). Congress, however, has already provided a mechanism for ensuring that SSA redetermination proceedings do not threaten criminal prosecutions: where a prosecutor provides a written certification stating that "there is a substantial risk that" conducting redetermination proceedings for a particular beneficiary "would jeopardize the criminal prosecution of a person involved in a suspected fraud," SSA must halt the redetermination

24

process. 42 U.S.C. § 405(u)(1)(A). If SSA is genuinely concerned about the potential risk of frustrating law-enforcement efforts, it should follow this statutory procedure, rather than deprive beneficiaries of procedural protections.

Therefore, we find that the third *Mathews* factor too weighs against SSA's position.

\*      \*      \*

As each of the three *Mathews* factors weighs in favor of mandating the procedural protection sought by Plaintiffs, we hold that the Due Process Clause of the Fifth Amendment required SSA to provide Plaintiffs and those similarly situated an opportunity to contest the Office of the Inspector General's fraud allegations as to their individual cases. By denying Plaintiffs this opportunity, SSA violated their procedural due process rights.

V.

We conclude that SSA's redetermination procedures violated both the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. Therefore, we affirm the judgment in No. 19-1989 and reverse in No. 19-2028. SSA's prior redetermination decisions as to Plaintiffs are vacated, and we remand both cases to the agency for further proceedings consistent with this opinion.

*19-1989 – AFFIRMED;*
*19-2028 – REVERSED*

QUATTLEBAUM, Circuit Judge, dissenting:

The Social Security Act (the "Act") sets forth a procedure known as a redetermination to address fraud. 42 U.S.C. § 405(u). It provides that the "Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits . . . if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The Act is also clear about how to handle suspect evidence included in such an application. "When redetermining the entitlement, . . . the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B).

The questions presented here are whether the Social Security Administration (the "SSA"), in interpreting these statutes, delineated procedures that violated the procedural due process rights of Gary Kirk and Larry Taylor and whether those same procedures were arbitrary and capricious under the Administrative Procedure Act (the "APA"). In my view, the redetermination process affords substantial due process more than sufficient to satisfy *Mathews v. Eldridge*, 424 U.S. 319 (1976), and does not run afoul of the APA. Consequently, I respectfully dissent.

I.

The facts here could pass for the plot of a John Grisham novel. Aptly-named Eric Conn, a lawyer in Pikeville, Kentucky, conspired with four doctors and an administrative law judge ("ALJ") to defraud the United States government out of millions of dollars in

26

Social Security benefits and millions more in attorney's fees. Conn advertised himself as "Mr. Social Security," inducing clients to hire him for assistance in obtaining benefits. *Hicks v. Colvin*, 214 F. Supp. 3d 627, 646 n.1 (2016) (hereinafter *Hicks I*). To pad his clients' applications, Conn gave pre-completed template Residual Functional Capacity forms ("RFC forms") to four crooked doctors, who would then sign off on applicants' disabilities. And, to stack the deck further, he paid off ALJ David Daugherty, who, in turn, funneled Conn's cases to his docket where he could rubberstamp applicants as disabled and award benefits. Under this arrangement, Conn's clients were awarded over $550 million in benefits. Sara Randazzo, *Lawyer Pleads Guilty in $550 Million Social Security Fraud Scheme*, WALL ST. J. (Mar. 27, 2017). Conn received over $5.7 million in fees, and the doctors and the ALJ were all paid handsomely. *See id*.

Conn's scheme began to unravel when a whistleblower reported concerns over ALJ Daugherty's docketing practices. The United States Office of Inspector General (the "OIG") began an investigation. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 793 (6th Cir. 2018) (hereinafter *Hicks II*); Damien Paletta, *Disability-Claim Judge Has Trouble Saying "No,"* WALL ST. J., May 19, 2011. Eventually, Conn pled guilty to theft of government money and paying illegal gratuities. Conn then escaped to South America, but his time there was short-lived. Police located and apprehended him at a Pizza Hut in La Ceiba, Honduras, where he was attempting to log on to WiFi. *Former Disability Attorney Eric Conn Captured in Honduras*, OFFICE OF THE INSPECTOR GENERAL: BEYOND THE NUMBERS (Dec. 8, 2017), https://oig.ssa.gov/newsroom/blog/dec8-conn-captured. Conn is currently incarcerated, serving a 27-year prison sentence, as are many of his cohorts.

By July 2014, the OIG "had identified 1,787 individuals—all of whom had been represented by Conn—whose applications, the OIG 'had reason to believe,' were tainted by fraud." *Hicks II*, 909 F.3d at 794. In May 2015, the OIG informed the SSA that it could proceed with redetermination hearings. As part of the redetermination process, in accordance with 42 U.S.C. § 405(u)(1)(B), the SSA excluded RFC forms submitted by Conn and the four implicated doctors because, according to the OIG, there was reason to believe those forms were tainted by fraud. Even so, the SSA reviewed those 1,787 files to determine whether there was sufficient evidence, besides the statutorily excluded forms, to support a disability determination. Of all the applicants identified by the OIG, the SSA determined that 1,500 had insufficient untainted evidence to uphold their initial benefits determination and would therefore be subject to redetermination proceedings. *Hicks II*, 909 F.3d at 818 (Rogers, J., dissenting).

Kirk and Taylor were two of Conn's clients who were required to undergo redetermination proceedings. Kirk filed for benefits in 2008, claiming his disability began in 2006. After his initial application was denied, Kirk hired Conn to represent him. ALJ Daugherty then issued a favorable decision in 2009, relying on records from one of the implicated doctors to find Kirk suffered from Arnold-Chiari Syndrome, Bell's Palsy, Sciatica and Low Back Pain and had limited residual functional capacity. As such, ALJ Daugherty found Kirk's disability began in 2006, and Kirk began receiving benefits from the SSA.

Kirk received notice on May 18, 2015, that he would be required to undergo a redetermination proceeding. As part of his proceeding, Kirk was permitted to submit

additional evidence of his disability and did so. The new ALJ, however, found Kirk was not disabled as of the date he had previously been awarded benefits. Kirk requested review by the SSA Appeals Council, which was denied. Kirk then filed suit, alleging five causes of action, including violations of procedural due process, the Act and the APA. A magistrate judge heard the parties on numerous motions, issued a Report and Recommendation and then stayed the case pending a final decision in *Hicks II*.[1] Given the uncertainty as to how and when the *Hicks II* litigation would proceed, the district court assumed responsibility for the case. After a final hearing on the merits, the court found the redetermination procedures violated Kirk's procedural due process and expressly reversed the SSA's prior redetermination decision. The SSA timely appealed.

Taylor filed an application for benefits in 2010, stating his disability began in 2010. Conn served as his attorney. The agency denied his initial application and his requested reconsideration. Taylor then requested a hearing before an ALJ. Subsequently, ALJ Daugherty issued a favorable decision without holding a hearing, relying on a medical examination report by yet another template-implicated doctor. ALJ Daugherty found Taylor suffered from acid reflux, fatty liver and anorexia and had limited residual functional capacity. Taylor then began receiving benefits.

---

[1] *Hicks II* was a consolidated appeal of eleven cases arising out of Conn's fraud before three different district court judges with nearly identical facts to those here. 909 F.3d at 791. As such, the magistrate judge may have thought the Sixth Circuit's decision would be informative.

Taylor, like Kirk, was notified on May 18, 2015, that he would have to undergo a redetermination proceeding. Taylor was afforded the same process as Kirk, and submitted additional evidence of his disability. At a hearing where he was represented by new counsel, the new ALJ found there was insufficient evidence to support Taylor's initial award of benefits. Taylor requested review of the decision, which the SSA Appeals Council denied. Taylor then sued, challenging the ALJ's redetermination decision and the Act's redetermination procedures. Acting pursuant to 28 U.S.C. § 636(c)(1), the magistrate judge granted the Commissioner's Motion for Summary Judgment on Taylor's claims that the redetermination procedures violated procedural due process, the Act and the APA. Taylor filed a Motion to Alter or Amend a Judgment. The court denied the Motion, and Taylor timely appealed. Kirk and Taylor's appeals have been consolidated for our review.

## II.

Kirk and Taylor argue, and the majority agrees, that the SSA's redetermination procedures violated their procedural due process rights. Specifically, they challenge the Act's exclusion of evidence from Conn's coconspirators. Even though they had notice and an opportunity to contest the subsequent termination of their benefits, they insist it was unconstitutional to exclude their suspect evidence without giving them an opportunity to

argue that, in their cases, the OIG had no reason to believe their RFC forms were fraudulent.[2]

To begin, while I reach a different conclusion, I agree with the majority and the district courts below that *Mathews* is the proper framework for this inquiry.[3] *Mathews* provides that, at the most basic level, "due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In evaluating this requirement, there is neither a set "form of hearing" required under due process nor a "technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 333–34 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). *Mathews* has long been heralded as the

---

[2] "This court reviews legal issues, including claims of due process violations, de novo." *United States v. Shealey*, 641 F.3d 627, 633 (4th Cir. 2011) (quoting *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004)).

[3] In spite of the overwhelming endorsement of the applicability and soundness of the *Mathews* test, Kirk and Taylor contend it does not apply here. Rather, they argue *Mathews* is merely a framework that rests on top of the due process floor established "[l]ong before *Mathews*." *Hicks II*, 909 F.3d at 797 (citing *Greene v. McElroy*, 360 U.S. 474 (1959)). As such, Kirk and Taylor argue *Mathews* only governs additional process. But this position contradicts both the text of *Mathews* and decades of Supreme Court precedent establishing that the *Mathews* test does not supplant a floor, but rather sets the constitutional floor. *Mathews*, 424 U.S. at 333 ("[S]ome form of hearing is required before an individual is finally deprived of a property interest."). *See also Turner v. Rogers*, 564 U.S. 431, 444 (2011) ("[W]e consequently determine the 'specific dictates of due process' by examining the 'distinct factors' that this Court has previously found useful in deciding what specific safeguards the Constitution's Due Process Clause requires in order to make a civil proceeding fundamentally fair." (quoting *Mathews*, 424 U.S. at 335)).

seminal case providing the tripartite analysis for courts to utilize when evaluating how much process is due:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

But in applying the *Mathews* framework, we must not forget the principles that anchor it. Procedural due process in the context of government entitlements sought to ensure "minimum procedural safeguards." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). The *Goldberg* Court emphasized "we . . . recognize the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by *rudimentary due process*." *Id*. (emphasis added). Six years later, the *Mathews* Court reaffirmed that "[i]n assessing what process is due . . . substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals." *Mathews*, 424 U.S. at 349. Without saying so, Kirk and Taylor effectively reject these precedential principles. Doing so, however, cuts *Mathews* loose from its moorings, rendering it merely a court's subjective view of the underlying interests at stake. *See Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 562 (1985) (Rehnquist, J., dissenting). Thus, with these important principles in mind, I turn to the *Mathews* analysis here.

A.

We look first to the private-interest prong of the *Mathews* three-part test. In this prong and throughout our analysis, it is important to keep our eye on the ball. There is only one constitutionally-protected private interest—Kirk and Taylor's ongoing receipt of benefits, provided they are eligible. *Goldberg*, 397 U.S. at 261–62 (holding an individual's interest in continued receipt of government benefits is a property interest protected by the Due Process Clause). Social Security disability benefits have long been afforded this protection, and undoubtedly should be. *Mathews*, 424 U.S. at 332.

Here, although there is only one constitutionally-protected interest, there are numerous determinations made—(1) the OIG's reason to believe fraud determination; (2) as a result of the OIG's determination, the SSA's "decision"[4] to redetermine benefits and exclude certain evidence; and (3) an ALJ's conclusion on Kirk and Taylor's eligibility for ongoing benefits. Kirk and Taylor seemingly mention these various determinations interchangeably with a goal of broadening their interest. They argue that the OIG's determination affected their rights because it triggered a redetermination hearing where they were unable to argue that the OIG had no reason to believe their template RFC form was fraudulent. The problem with this argument, however, is that Kirk and Taylor have no

---

[4] The SSA's redetermination of benefits and exclusion of suspect evidence based on the OIG's determination is statutorily mandated. 42 U.S.C. § 405(u)(1)(A)–(B).

constitutionally-protected property interest in those decisions, or in avoiding redeterminations for that matter. They only have such an interest in the decision about whether their benefits should continue. As described more below, this failure of Kirk and Taylor to identify the proper interest infects their entire analysis.

Further, even with our eyes fixed on the proper interest, *Mathews* requires more than determining whether there is a private interest at stake. It requires courts to consider the extent of that interest. Several mitigating considerations reduce the significance of the interest here.

First, Kirk and Taylor suggest consideration of their individualized circumstances. For example, they point to the specific economic hardships they have suffered from the redetermination of their benefits. But without disputing—or lacking sympathy for—Kirk and Taylor's circumstances, *Mathews* requires consideration of the categorical interest, not any one applicant's personal interest. *See id*. at 340–42. And according to the Supreme Court, the potential deprivation from losing disability benefits is generally less than that of welfare recipients because "[e]ligibility for disability benefits, in contrast, is not based upon financial need." *Id*. at 340–41. This is so because:

> [Eligibility for disability benefits] is wholly unrelated to the worker's income or support from many other sources, such as earnings of other family members, workmen's compensation awards, tort claims awards, savings, private insurance, public or private pensions, veterans' benefits, food stamps, public assistance, or the 'many other important programs, both public and private, which contain provisions for disability payments affecting a substantial portion of the work force . . . .'

*Id*. at 340–41 (quoting *Richardson v. Belcher*, 404 U.S. 78, 85–87 (1971) (Douglas, J., dissenting)). Thus, while the Social Security benefits Kirk and Taylor were receiving are

entitled to protection, the private interest in them is less than that in benefits tied to financial need.[5]

Similarly, Kirk and Taylor improperly emphasize that, under the redetermination process, an individual applicant could be required to repay previously provided benefits. Relevant to this issue, the Act provides a procedure by which past overpayments may be waived. *See* 42 U.S.C. § 404(b). And 98% of waivers have been granted in Conn's cases. *Hicks II*, 909 F.3d at 816 (Rogers, J., dissenting).[6] Indisputably, Kirk and Taylor have both already received waivers. Widespread waiver, not individual debt, is the proper categorical consideration.

Additionally, applicants may submit a new application for benefits. I fully recognize there is an obvious difference in the benefits an individual may receive by new application.[7]

---

[5] Kirk and Taylor, under their initial applications, applied for and were awarded Social Security Disability Insurance ("SSDI") benefits, which are unrelated to financial need. J.A. 86, 246. Kirk also applied for and was awarded Supplemental Security Income ("SSI"), which is need based. J.A. 86. On reapplication, however, both were only awarded SSI. Opening Br of Comm'r at 31. *See infra* note 7.

[6] SSA estimates this figure as slightly less, that 93% of waivers have been granted in Conn's cases with the remaining 7% denied because of beneficiaries' ability to pay in full or in part. Opening Br of Comm'r at 30–31.

[7] This difference stems from the existence of two different disability benefits programs—SSI and SSDI. SSI is a need-based program to provide income to meet the basic needs of older adults or adults with disabilities. *Supplemental Security Income Home Page – 2020 Edition*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/ssi/ (last visited Jan. 14, 2021). SSDI, however, does not consider need. *Disability Benefits*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/benefits/disability/ (last visited Jan. 14, 2021). Rather, it provides income to disabled adults who have worked long enough and recently enough to qualify. *Id*. The disability requirement for both programs is the same. *Id*. But the amount of the benefit varies significantly—on average, a monthly SSI benefit

For example, Taylor, after submitting a new application, received SSI benefits of $191.31 per month, a small sum compared to his previous SSDI benefits of $1,778.90 per month. Taylor, however, no longer receives SSI because he now receives retirement benefits and, thus, no longer meets financial eligibility requirements for SSI benefits. Opening Br of Comm'r at 31. The record does not provide as clear a picture of Kirk's benefits before and after redetermination, but it is clear that Kirk currently receives SSI benefits. *Id.* Acknowledging the significant difference in amount, it is an amount nonetheless, and that must be considered when assessing the private interest.

In sum, as to the first *Mathews* factor, disability claimants in general possess a substantial private interest. But in my view, the majority gives too much weight to this interest. It also gives too little weight to widely available mitigating measures, which artificially inflates the significance of the individual interest at stake. A waiver of overpayment and a new application for benefits "right-sizes" this interest.

B.

Turning now to the second factor of *Mathews*, we again must keep our eye on the ball to avoid conflating the actual risk of error at issue—the wrongful termination of benefits—with the related but distinct risk of the wrongful exclusion of evidence. Kirk and Taylor focus on the latter, emphasizing they received no notice or opportunity to rebut the

---

is $575.73 compared to a monthly SSDI benefit of $1,142.68. *Monthly Statistical Snapshot December 2020*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/index.html (last visited Jan. 14, 2021).

exclusion of evidence. That may be true. But it is not the proper question in this procedural due process analysis. The risk of error relates not to the decision to exclude evidence but instead to the decision about ongoing benefits. The majority gives virtually no attention to this distinction, but, with our eye on the ball, it is clear that *Mathews* applies only to the decision about benefits. 424 U.S. at 335 (identifying the second factor as "the risk of an erroneous deprivation of such [private] interest").[8]

And the risk of erroneous termination of benefits, like the first factor, requires categorical review. The risk must be inherent "to the generality of cases, not the rare exceptions." *Id*. at 344. Risk is assessed first by the likelihood of error following the current procedures—excluding evidence where there is reason to believe it is tainted by fraud and permitting applicants to supplement new and/or reliable former evidence, and second, by the value of the additional procedure proposed here.

---

[8] The SSA's blanket prohibition on suspect evidence is consistent with *United States v. Scheffer*, 523 U.S. 303 (1998). In *Scheffer*, Military Rule of Evidence 707 prohibited the introduction of all polygraph testimony based on insufficient scientific acceptability. *Id*. at 306–07. Scheffer, who wanted to present polygraph evidence to exonerate himself, argued the ban interfered with his Sixth Amendment right to present a defense. *See id*. at 306–07 The Supreme Court held that even in a criminal trial, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. A defendant's interest in presenting such evidence may thus bow to accommodate other legitimate interests in the criminal trial process." *Id*. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)) (internal citations and quotation marks omitted). As such, because the exclusion served legitimate interests, chief among them, reliability of evidence, the ban was not arbitrary, even where there was dispute as to the reliability of the evidence. *Id*. at 308, 310. Moreover, it did not "infringe[] upon a weighty interest of the accused." *Id*. at 308. It is difficult to contemplate a more weighty interest than that of the criminally accused in presenting a defense. If Scheffer's interest must yield, so should Kirk and Taylor's.

The current process poses minimal risk of an erroneous deprivation because each step in Kirk and Taylor's redetermination proceedings reduced risk. After an investigation, and consistent with the Act, the OIG notified the SSA that it had reason to believe that fraud was involved in the claims of Conn's clients. After that, the SSA Appeals Council reviewed each of those 1,787 files to evaluate whether they contained sufficient evidence without the forms submitted by Conn's coconspirators to support the original disability determination. Over 250 did and their benefits were not disturbed. *Hicks II*, 909 F.3d at 818 (Rogers, J., dissenting). The benefits for applicants like Kirk and Taylor, who lacked sufficient documentation to support the original determination, were not automatically terminated. The SSA notified such applicants that further proceedings were required. The SSA notified them that they could submit new evidence for a second review by the Appeals Council and would, in accordance with statute, assist applicants in developing new evidence. *Id*. at 819 (Rogers J., dissenting). If the Appeals Council ruled against these applicants in its second review, the SSA afforded applicants a new hearing before a new ALJ. The SSA notified applicants that it would provide more time if needed. At the hearing—which was individualized and where applicants were represented by counsel—applicants could testify and offer additional or new evidence to show the ALJ they were entitled to disability benefits. By any measure, this is substantial process. Of Conn's former clients, nearly 845 have received favorable benefits decisions on redetermination. In sum, of the 1,787 total victims, 1,095 have navigated the aftermath and retained their benefits, or 64%. To quote Judge Rogers, "[t]hat is textbook due process." *Id*. at 816 (Rogers, J., dissenting).

Kirk and Taylor disagree with the adequacy of this process, in part, by insisting the ability to present new evidence is difficult years after their initial disability determination. They argue, and the majority agrees, that the inadequacy is manifest in the different outcomes: with the RFC forms they were awarded benefits and without them they were denied. But greater difficulty does not equal constitutional infirmity. Even if their original files did not establish disability independent of the records from the crooked doctors, Kirk and Taylor had the opportunity to be evaluated by a new doctor before their redetermination hearing and submit a new RFC form, or any other evidence for that matter. There is no reason a new doctor could not confirm their ongoing disability and opine that the symptoms and restrictions are consistent with a disability that began years before. Nothing presented by Kirk and Taylor suggests that such evidence would not be sufficient to enable them to continue receiving their benefits. Here, Kirk and Taylor have let their quest for perfect evidence be the enemy of good evidence. And by agreeing, we set the procedural due process bar way too high.

Further, it is hardly surprising, given the factual context, that some applications were denied during the redetermination process. Keep in mind that Conn conspired with doctors and an ALJ to game the Social Security system. The fact that some clients were unable to establish disability without the records of the bought and paid for doctors might actually mean they were never disabled in the first place rather than their benefits were wrongfully terminated. Either way, they were afforded process to make their case with a low risk of error.

On top of the low risk of erroneous deprivation of benefits, the additional procedure sought by Kirk and Taylor provides minimal additional protection. Kirk and Taylor's position on the additional procedure sought has shifted during this appeal. In their briefs, the two vaguely contend that the additional procedure sought is "the right to be heard on the fraud assertion." Pls' Principal & Resp. Br at 39. And subsequent statements in their brief suggest being heard, in their view, requires the OIG investigators to testify. *Id*. at 45. But at oral argument, Kirk and Taylor walked that back, indicating unequivocally they seek something less burdensome than that—something like requiring an OIG affidavit or allowing them to file a motion in limine.

But neither additional procedure materially reduces the risk of an erroneous deprivation of disability benefits because their argument hinges on being a "needle in the haystack," a nonfraudulent RFC form among hundreds of fraudulent RFC forms Conn submitted. *Hicks I*, 214 F. Supp. 3d at 643. But again, this fails to keep an eye on the ball; our focus for *Mathews* is not on whether their RFC form was or was not fraudulent—the OIG needs only reason to believe their form was fraudulent. It is on the ultimate decision about continuing disability benefits. And that decision contains all the process described above.

Still, Kirk and Taylor protest this additional procedure, like a motion in limine, is necessary. Thus, we are constrained to carry their argument to its logical end—Kirk and Taylor would move in limine to admit their RFC form. To prevail, Kirk and Taylor would have to show that there was no reason to believe their RFC form was fraudulent. For example, Taylor's excluded RFC form contained the crooked doctor's reference to and

40

subjective interpretation of bloodwork and a CT scan.[9] J.A. 281–87. But the problem with their argument could not be clearer—the doctor is on the take. Then, in opposition, the SSA would put forth prolific evidence of Conn's fraud and the doctor's involvement, making it hard to see how this additional procedure could ever rebut the low threshold required under the OIG's "reason to believe" fraud finding, 42 U.S.C. § 405(u)(1)(B), let alone reduce the risk of error.

What's more, Social Security regulations make clear that only evidence from treating physicians is given controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). The four doctors on Conn's payroll were not treating physicians. Thus, their evidence is, by law, given less weight in the first place.

Also, it cannot be forgotten that the RFC forms here are but one link in an entirely fraudulent chain, one in which the implicated doctors had Conn's money in their pockets as they filled out his forms. Kirk and Taylor might just as easily argue that ALJ Daugherty, although corrupt most of the time, carried out his judicial responsibilities with integrity in their cases. Or that Conn himself might have been a crook but did not commit fraud in their individual matters. Unsurprisingly, Kirk and Taylor make no such arguments as to either

---

[9] Although the majority questions whether the SSA wrongfully excluded additional evidence contained in and attached to the template RFC forms, such exclusions should have no material effect on our *Mathews* analysis. First, remember that the statutory standard for exclusion is low. The OIG must only determine that there is "reason to believe" fraud exists. Any evidence contained in the forms completed by the implicated doctors and submitted by Conn satisfies this standard. And second, at oral argument, the SSA indicated that if evidence was available via a neutral third-party—for example, from a laboratory— it would not be excluded from consideration.

ALJ Daugherty or Conn; and the same futility permeates their RFC form argument as well. Being afforded "the right to be heard on the fraud assertion," via either full-blown hearings, affidavits or motions in limine cannot meaningfully cure their application infirmities.

Kirk and Taylor are certainly correct that there is some risk of wrongful deprivation. But it is difficult, if not impossible, to think of a process that could ever have zero risk. And in fact, nothing in the Constitution requires that. Here, there is minimal risk of an erroneous deprivation. And the additional procedural safeguards Kirk and Taylor seek would do little to reduce that already minimal risk. Thus, I disagree with the majority; the second prong of *Mathews* weighs strongly against Kirk and Taylor.

C.

Lastly, the third factor of *Mathews* considers the government's interest and the burdens the additional procedural requirement would impose. Kirk and Taylor seek to distract from the government's interest by focusing merely on time and cost of the additional procedure. But that again misconstrues the inquiry—the inquiry is first, the government interest, and then any burdens imposed by the additional requirement. Here, the government interest includes the entire public perception of disability benefits and the SSA. "[T]here is an enormous public interest in avoiding the taint of fraud on determinations by one of the largest and most significant government benefits programs in the United States." *Hicks II*, 909 F.3d at 817 (Rogers, J., dissenting). One can hardly question the significance of this interest. Indeed, the majority rightly puts this into the proper perspective by acknowledging "Conn orchestrated one of the largest fraud schemes in the history of the [SSA]." Maj. Op. at 3.

The government's interest also includes prevention of similar schemes. Undoubtedly, if the government has an interest in anything—it is preventing fraud of this kind and this magnitude. And that includes systematic deterrence of applicants who are not legitimately disabled.

After considering the government interest, we must then consider the burden of the additional requirement sought. Here, if Kirk and Taylor seek more thorough hearings with the OIG investigators subject to cross-examination, "[t]here are significant administrative costs." *Hicks II*, 909 F.3d at 817 (Rogers, J., dissenting). "[G]rafting . . . evidentiary mini-trials onto the redetermination process would thwart Congress's objective of redetermining benefits effectively and immediately." *Id*. at 817–18 (Rogers, J., dissenting). Alternatively, if Kirk and Taylor do, in fact, seek merely an affidavit from the OIG investigators or a motion in limine, the burden appears lower by comparison. Yet this would still require the OIG to engage in individualized litigation in systemic fraudulent schemes. For example, the OIG would be required to prepare nearly 1,500 individualized responses defending its determination[10] that there was reason to believe evidence was fraudulent where perpetrators of a colossal fraud have indisputably been convicted of that fraud. Moreover, the burden presented by a motion in limine must still be compounded with the government's weighty interest. As such, because the government's interest is so

---

[10] Again, we must keep our eye on the ball—this additional procedure is imprecisely aimed at a determination in which Kirk and Taylor have no private interest.

significant, the burden here still does not flip the scales against the current redetermination process. The third factor weighs against Kirk and Taylor.

D.

In conclusion, if we, in accordance with precedent, insist that the process required need only be minimal, or even adequate, as opposed to ideal, defer to the good-faith judgment of the SSA and keep our eyes fixed on the only constitutionally-protected property interest, there is no constitutional defect here. The SSA's redetermination proceedings concern a substantial interest of Kirk and Taylor. But the risk of erroneous deprivation and value of additional procedures sought is low and the government's interest is especially strong. Under *Mathews*, I would find the SSA's current redetermination procedures do not violate Kirk and Taylor's procedural due process rights.

III.

Turning to Kirk and Taylor's APA claim, and for many of the same important reasons underlying the government interest under *Mathews*, I would find the redetermination procedures are neither arbitrary nor capricious. When evaluating an agency action, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. The foregoing statutory criteria render our oversight highly deferential, with a presumption in favor of finding the action valid . . . ." *Ergon-West Virginia, Inc. v. United States Envtl. Prot. Agency*, 980 F.3d 403, 410 (4th Cir. 2020) (internal citations and quotation marks omitted).

Under 5 U.S.C. § 706(2)(A), courts must "set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." Kirk and Taylor argue that because suspect evidence in their applications, discovered by the OIG, is treated differently than suspect evidence found by the SSA, the redetermination procedures violate the APA. They contend the only difference between the fraud in Conn's grand scheme and a garden-variety SSA fraud claim is whether it originated from the OIG or the SSA. Thus, according to Kirk and Taylor, and now the majority, the APA requires their process be the same as any applicant accused of fraud.

The majority is correct that, as a general rule, it is "[a] fundamental norm of administrative procedure . . . to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). But that general principle does not require the SSA to determine what cases are alike based on the broadest category of the claim. Rather than treating any inquiry into fraud the same, the SSA, by the Act and its implementing procedures, distinguishes between a one-off claim of fraud and a large-scale investigation by the OIG. This is neither arbitrary nor capricious; in fact, it makes good sense. This case illustrates why—when an OIG investigation revealed an operative scheme replicated over 1,700 times involving the same fraudster attorney, same judicial and medical conspirators and same template-RFC forms, the process should be the same for the OIG bundle of cases. The OIG has before it a mountain of evidence and facts common to 1,700 cases. A garden-variety fraudulent application would share none of those similarities.

45

Moreover, unlike a garden-variety fraud claim, all cases involving Conn's clients were investigated by the OIG itself. Kirk and Taylor, as well as the majority, may find this distinction insignificant. But the OIG is the chief independent and trained watchdog for government oversight. *See* 5 U.S.C. App. 3 §§ 2, 6. The OIG has 1,296 full-time positions dedicated to Medicaid and Medicare fraud alone. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL, FISCAL YEAR 2021 JUSTIFICATION OF ESTIMATES FOR APPROPRIATIONS COMMITTEES 3 (2020).

On the other hand, the SSA's investigations, conducted by personnel within the very agency making decisions regarding benefits eligibility, concern only isolated fraudulent applications. Thus, the two investigations present differing degrees of risk of error or bias, with the SSA's investigations being afforded more evidentiary process to address those risks. One might certainly argue there is a better way to address these different type of fraud claims. But that, of course, is not our question. Our question is whether the SSA's procedures are arbitrary or capricious. They plainly are not.

And Kirk and Taylor's argument and the majority's reasoning would mandate that the SSA draw likeness at the highest common denominator. Nothing in the APA, nor any other authority of which I am aware, however, requires that. And think of the consequences of putting such a straitjacket on the SSA. If we assume all Conn's clients must be able to rebut the claim that there was reason to believe their RFC form involved fraud, could an ALJ decide certain cases on the briefs but allow other claimants an evidentiary hearing?

Does the time period for conducting the hearings have to be the same? Just how alike do the procedures have to be?[11]

And what about other agencies? Kirk and Taylor's argument would seem to say that courts must always find different procedures arbitrary and capricious so long as both govern the same thing at the highest common denominator. But that is hardly our role. *Arkansas v. Oklahoma*, 503 U.S. 91, 14 (1992) ("It is not [the Supreme Court's] role, or that of the Court of Appeals, to decide which policy choice is the better one, [when] it is clear that Congress has entrusted such decisions to the . . . Agency.").

The SSA is entitled to draw its own line of likeness so long as it is not arbitrary and capricious. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978) (stating it is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure"). *See also Hall v. McLaughlin*, 864 F.2d 868, 873 (D.C. Cir. 1989) ("[W]here a particular agency action does not appear to be inconsistent with prior decisions, the agency's explanation need not be elaborate."). Here,

---

[11] Kirk and Taylor's arguments would also create a paradox for the SSA. By asking the SSA to examine their evidence individually, when in fact, the evidence was all created and submitted in largely the same routine manner by Conn and his associates, none of Conn's applicants would get the same treatment. There would be a host of different outcomes on the admissibility of the template RFC forms. In effect, treating Conn's applicants as members of a larger pool of "general fraud" would have the effect of rendering this scheme merely 1,787 isolated incidents of fraud, when that is patently false. Moreover, such treatment undercuts the legitimacy of benefits awarded to the 1,095 individuals who have already navigated these same procedures.

because there are significant differences between cases investigated by the OIG and the SSA, the different treatment of evidence easily survives arbitrary and capricious review.[12]

IV.

In summary, Kirk and Taylor take the position that the only difference between their initial hearings and their redetermination hearings is the exclusion of an RFC form. But that disregards the other undisputed problems with their initial hearings—Conn was a fraud, the ALJ was a fraud and the doctors were frauds, perpetuating a scheme that awarded disability benefits to 1,787 individuals (some of whom likely were not initially disabled or are no longer disabled) and cost the SSA over $550 million. Given those facts, the process afforded Kirk and Taylor was more than adequate and neither arbitrary nor capricious. Therefore, I respectfully dissent and would reverse the district court's judgment as to Kirk and affirm as to Taylor.

---

[12] Kirk and Taylor argue that the SSA's post-hoc rationalizations for different treatment of similarly situated cases are arbitrary and capricious. But this puts the cart before the horse. Unless cases are similar, different treatment is permissible. *Westar Energy, Inc.,* 473 F.3d at 1241 ("A fundamental norm of administrative procedure requires an agency to treat like cases alike. If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases.").