**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-1632**

U. S. TRUSTEE,

                Plaintiff – Appellee,

v.

DARREN THOMAS DELAFIELD,

                Defendant – Appellant,

and

UPRIGHT LAW, LLC; LAW SOLUTIONS CHICAGO, LLC; JASON ROYCE ALLEN;
KEVIN CHERN; EDMUND SCANLAN; SPERRO, LLC; JOHN CARTER MORGAN,
JR., PLLC; JOHN C. MORGAN,

                Defendants,

ANDRIAN SHANNON WILLIAMS; TIMOTHY JAMES WILLIAMS, JR.,

                Respondents.

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke.  Michael F. Urbanski, Chief District Judge.  (7:20-cv-00714-MFU)

Argued:  October 25, 2022                          Decided:  January 11, 2023

Before KING and QUATTLEBAUM, Circuit Judges, and M. Hannah LAUCK, United
States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge King and Judge Lauck join.  Judge King wrote a concurring opinion.

---

**ARGUED:**  Darren Thomas Delafield, LAW OFFICE OF DARREN DELAFIELD, PC, Roanoke, Virginia, for Appellant.  Sumi Kay Sakata, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Ramona D. Elliott, Deputy Director/General Counsel, P. Matthew Sutko, Associate General Counsel, Executive Office for United States Trustees, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John P. Fitzgerald III, Acting United States Trustee, Region 4, Margaret K. Garber, Assistant United States Trustee, W. Joel Charboneau, OFFICE OF THE UNITED STATES TRUSTEE, Roanoke, Virginia, for Appellee.

---

2

QUATTLEBAUM, Circuit Judge:

A bankruptcy court imposed sanctions against Darren Thomas Delafield. After the district court affirmed those sanctions, Delafield appealed, asserting the sanctions order violated his due process rights. To be sure, a lawyer facing suspension or disbarment is entitled to notice of the charges for which such discipline is sought and an opportunity to be heard on those issues. *Nell v. United States*, 450 F.2d 1090, 1093 (4th Cir. 1971). But our review of the record reveals that Delafield was afforded sufficient process. Thus, we affirm.

I.

The sanctions arose from an adversary proceeding in the bankruptcy court brought by the United States Trustee against Delafield, UpRight Law LLC, Sperro LLC and other defendants. J.A. 1. UpRight is a Chicago-based bankruptcy legal services company that operates through a nationwide network of "local partners." J.A. 679–80. After Delafield signed a partnership agreement with UpRight, he filed more than 30 bankruptcy cases as a partner. J.A. 682–83.

The United States Trustee's complaint sought sanctions for Delafield's representation of UpRight clients Timothy and Andrian Williams. J.A. 691. The Trustee alleged the Williamses participated in Upright's New Car Custody Program ("NCCP"). UpRight operated the NCCP through a partnership with Sperro, a separate company in the repossession industry. J.A. 7–9. Through the program, UpRight purported to assist clients that needed to surrender possession of their cars by offering Sperro's services. But in

3

practice, UpRight actually just funneled bankruptcy clients to Sperro. Then, Sperro, for no legitimate reason other than to generate profits for itself, took custody of debtors' cars and towed them to lots in Nevada, Mississippi or Indiana—where mechanic's liens or storage liens can trump first liens in certain circumstances.[1] J.A. 687.

Sperro earned money in one of two ways. First, it charged "excessive hookup, towing and storage fees that[, according to the bankruptcy court,] were completely unnecessary." J.A. 687. Second, sometimes creditors abandoned their interests in the car rather than pay the excessive fees to recover the car. In those situations, Sperro auctioned the car and retained the proceeds. *Id.*

In exchange for funneling bankruptcy clients into the NCCP, Sperro paid UpRight's clients' attorney's and filing fees. So UpRight's fees were paid by a company that fraudulently generated towing charges and paid them by forcing the sale of cars at the expense of the lenders who held the first liens.

---

[1] To understand first liens on vehicles, assume John Smith wants to buy a car. The car costs $10,000 but Smith only has $5,000. Smith borrows $5,000 from ABC Finance. So, Smith uses his $5,000 and the $5,000 he borrowed from ABC Finance to buy the car. Smith agrees to pay back ABC Finance over time. ABC Finance can complete paperwork that gives it a "first lien" on the car that Smith buys. That allows ABC Finance, if Smith does not repay the loan, to repossess the car and sell it to recover the money it loaned.

As for mechanic's and storage liens, assume the car that ABC Finance loaned Smith money to buy breaks down and needs to be towed. XYZ Towing agrees to tow it. But, if Smith cannot pay the tow bill, XYZ Towing can assert a lien to cover the costs of what it is owed for towing the car. That allows it to force the car to be sold to pay the towing bill. But even though XYZ Towing can force a sale of the car, ABC Finance, which has the first lien, gets paid first. And many times, the vehicle is not worth enough to pay back ABC Finance, much less XYZ Towing. But in Nevada, Mississippi or Indiana, things work differently. In those states, mechanic's and storage liens, depending on the circumstances, can force the sale of the car without a judicial determination that first liens are paid first.

4

The United States Trustee's complaint alleged Delafield learned about the NCCP through an email from UpRight. J.A. 7. The email provided that for debtors to qualify for the program, they must want to file for Chapter 7 bankruptcy and have a vehicle, motorcycle, boat, truck or other property—with no equity and a value more than $5,000— that they are willing to surrender. *Id.* The email also stated that "[i]mmediately upon placing the vehicle in Sperro's custody, Sperro will remit the entire legal fee plus filing fee to UpRight Law on client's behalf." *Id.*

The complaint alleged that Delafield filed the Williamses' Chapter 7 bankruptcy petition after he learned of the NCCP and their participation in the program. J.A. 7, 15, 17–18. It asserted that when asked about the NCCP at the Williamses' meeting of creditors, Delafield explained that Sperro paid the Williamses' legal fees, denied knowledge of why it did so and deflected questions about the NCCP. J.A. 16.

The complaint alleged that Delafield's participation in the NCCP amounted to unethical and illegal conduct. J.A. 19. It cited the provisions of the Bankruptcy Code Delafield allegedly violated. J.A. 18–22. And among other sanctions, it sought a minimum of $5,000 in civil penalties from Delafield and an order prohibiting him from practicing before the bankruptcy court. J.A. 21.

Ultimately, the bankruptcy court held a four-day trial.[2] J.A. 669. In addition to information about the NCCP, the United States Trustee introduced evidence about

---

[2] The trial involved claims against Delafield, UpRight and other individual defendants. While Sperro was a named defendant, it did not file a response or appear in the action. J.A. 669.

UpRight's practices for onboarding clients. When a potential client reached out to UpRight, its "client consultants" were encouraged to use hard sell tactics, as documented in UpRight's "Sales Play Book." J.A. 673–74. For example, the Sales Play Book recommended the following responses if a potential client said "I need to talk to my Wife/Husband": "I agree, and you should, but if your husband/wife is anything like mine, he/she never tells me no when I really need or love something, and I never tell him/her no" or "[b]etter to ask for forgiveness than ask for permission, so let's get you going right away." J.A. 673. The Sales Play Book also advised consultants to make "now or never" offers. J.A. 673. The complaint alleged—and the bankruptcy court confirmed—that nonlawyer client consultants provided potential clients with legal advice, despite UpRight's instruction that they should not do so. J.A. 9, 674.

The United States Trustee also introduced evidence about Delafield's conduct once a conflict of interest arose between the Williamses and UpRight. The conflict arose when the United States Trustee issued subpoenas to the Williamses. J.A. 697. The United States Trustee introduced evidence that UpRight, through another of its attorneys, "used heavy handed tactics, including text messages, to try and get the Williamses to sign conflict waivers." J.A. 697. These waivers could have allowed UpRight to assert the attorney-client privilege on behalf of the Williamses and shielded UpRight's files from discovery. J.A. 697. The United States Trustee introduced evidence that Mr. Williams called the Trustee and advised he "did not want to sign [a conflict waiver];" that Upright also sent the Williamses a conflict waiver letter suggesting that the Williamses' discharge might be at

6

issue; and that Mr. Williams said Delafield told him that "if [he] did not sign the [conflict] waiver that he would be solely looking out for himself only." J.A. 698.

Following the trial, the bankruptcy court ordered Delafield to pay $5,000 to the Williamses and revoked his privileges to practice before the bankruptcy court for one year. J.A. 669, 726. The bankruptcy court sanctioned Delafield for his relationship to UpRight's NCCP and its client onboarding practices. The bankruptcy court determined that the purpose of the NCCP was to "prime secured lenders" and "hold their collateral hostage," with UpRight and Sperro benefitting from the lenders' losses. J.A. 687. The court further found that UpRight's client consultants "engaged in numerous instances of providing impermissible legal advice to potential clients, albeit alleged violations of Upright's policies, and some of it was just outright wrong, such as advising clients to hide collateral or leave certain debts off their schedules." J.A. 725. The court noted consultants' "overreaching conduct is not surprising[,]" given the "pressure to hit sales and commission targets." *Id.*

The bankruptcy court also found that Delafield violated Virginia Rules of Professional Conduct 5.1 and 5.3. J.A. 723–24. The court recognized that Delafield did not design or implement the NCCP program. Nor did he himself engage in UpRight's unsavory onboarding practices. But the court held that under Rule 5.1(c)(1), a lawyer is responsible for another lawyer's conduct if he "orders or, with knowledge of the specific conduct, ratifies the conduct involved[.]" Va. Rule of Prof. Conduct 5.1(c)(1). Because Delafield filed the Williamses' case with knowledge that they had participated in the NCCP and

7

knowledge of how the NCCP worked, the bankruptcy court found that he ratified the conduct in violation of Rule 5.1(c)(1). J.A. 724.

Further, the bankruptcy court noted that Delafield "professed ignorance about much of what the sales people did[3] and how the cases were handled in Chicago." J.A. 725–26. Despite that, citing Rule 5.3,[4] the court concluded that Delafield "should have known more about all of these matters." J.A. 726.

In addition to UpRight's conduct, the bankruptcy court cited Delafield's individual actions in the Williamses' case as a basis for sanctions. Namely, the court found that he "attempted to deflect any questions regarding [the NCCP] by the Trustee and [creditor's] counsel to an unidentified 'senior attorney' at UpRight for further explanation, professing ignorance as to the relationship between Sperro and UpRight." J.A. 692. The court found such statements were "less than forthcoming." J.A. 723. It also found that Delafield filed an amendment to the Williamses' bankruptcy petition without obtaining a wet signature or their permission. J.A. 723. And the court found that Delafield acted inappropriately "when it appeared he had a conflict of interest when the [NCCP] came to light . . . ." J.A. 723.

---

[3] For example, one UpRight salesperson advised the Williamses to keep their car hidden from their creditor until Sperro could pick it up. J.A. 690.

[4] Rule 5.3(a) requires a "partner or lawyer who individually or together with other lawyers possesses managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer."

II.

Delafield claims the bankruptcy court's sanctions order, which the district court affirmed, violated his due process rights.[5] Whether a litigant was afforded due process is a legal question that is reviewed de novo. *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 320 (4th Cir. 2021). Delafield asserts that the bankruptcy court imposed sanctions "for which no advance notice was given, and for which an incomplete hearing was held." Appellant Op. Br. 32. In advancing this argument, he contends the United States Trustee's complaint was deficient. More specifically, he argues that the bankruptcy court sanctioned him for violating the Virginia Rules of Professional Responsibility, which were not identified in the complaint, and for attempting to convince the Williamses to waive any conflict of interest, which is post-complaint conduct that was never added through an amended complaint. He also argues that, as a "shotgun" pleading, the complaint provided him insufficient detail to allow him to prepare a defense. Appellant Op. Br. 35–36.

Delafield's arguments on appeal implicate our decision in *Nell v. United States*, 450 F.2d 1090 (4th Cir. 1971). There, the complaint against a lawyer who was suspended only provided notice "that a proceeding of some kind was to be held" and that there were concerns of lawyer misconduct. *Id.* at 1093. Also, the only relief sought in that complaint

---

[5] Delafield also complains that the order is not supported by the record. "In reviewing the judgment of a district court sitting in review of a bankruptcy court, . . . we review the bankruptcy court's legal conclusions de novo, its factual findings for clear error, and any discretionary decisions for abuse of discretion." *Copley v. United States*, 959 F.3d 118, 121 (4th Cir. 2020). Our review of the record reveals no error in the bankruptcy court's factual findings, nor do we find that the bankruptcy court abused its discretion in sanctioning Delafield.

9

was reopening of the judgment in the underlying case. *Id.* It did not indicate that the proceedings would be expanded to include disciplinary proceedings. *Id.* Thus, the lawyer in *Nell* was unaware he was facing suspension until the hearing actually occurred. *Id.* We explained that due process "requires that disbarment or suspension proceedings be preceded by adequate notice and an opportunity to prepare a defense." *Id.* And we held the lawyer in *Nell* was not afforded sufficient due process. *Id.*

Under *Nell*, Delafield was entitled to "notice and an opportunity to prepare a defense." *Id.* But unlike the lawyer there, Delafield received both notice and the opportunity to prepare. The United States Trustee's complaint provided detailed and specific allegations of misconduct against Delafield, his law firm and his fellow partners related to the NCCP. The complaint also specified the provisions of the Bankruptcy Code that the Trustee alleged Delafield violated. And it accused Delafield of illegal and unethical conduct regarding the NCCP. Finally, the complaint identified the exact sanctions that were ultimately imposed against Delafield: a $5,000 fine and disbarment. True, as Delafield notes, the complaint did not cite to the Virginia Rules of Professional Conduct that Delafield was ultimately found to have violated. Identifying such rules is certainly preferred in an action seeking suspension or disbarment. But this omission did not violate Delafield's due process rights. The complaint adequately notified Delafield of the conduct for which he was being accused and the sanctions that were being sought.

Additionally, Delafield received an opportunity to prepare and present a defense. He was afforded the opportunity to conduct discovery before trial. Then, at trial, Delafield

10

presented evidence, cross-examined witnesses called by the United States Trustee and made arguments before the bankruptcy court.

We are also unconvinced by Delafield's claim that the bankruptcy court should have ignored his post-complaint conduct in seeking conflict of interest waivers from the Williamses. The bankruptcy court found the evidence related to the NCCP. The court explained that it admitted and considered evidence of Delafield's post-complaint misconduct to rebut his arguments that he had taken corrective action after his initial misconduct concerning the NCCP. J.A. 492–93. It found that obtaining waivers allowed Delafield to assert the attorney client privilege to conceal information about the NCCP. *Id*. Thus, the post-complaint conduct showed that, instead of correcting matters, Delafield continued his misconduct related to the NCCP. Finally, Delafield was given the opportunity to respond to the post-complaint conduct issues through his direct testimony and post-complaint briefing. [6]

For the foregoing reasons, we conclude that Delafield was afforded adequate due process and we affirm the district court's order.

*AFFIRMED*

---

[6] Delafield also asserts that the $5,000 sanction imposed was criminal in nature, and that he was not given notice that any criminal sanction was to be sought. However, we find this argument unpersuasive, given that the sanction was designed to promote deterrence and compensate the Williamses. *See In re Dyer*, 322 F.3d 1178, 1192 (9th Cir. 2003) (holding penalties designed to coerce compliance are civil in nature). The bankruptcy court noted that Delafield had "a past disciplinary history . . . specifically designed to correct past practice deficiencies" and that it believed "lesser discipline would not be effective" here. J.A. 726.

KING, Circuit Judge, concurring:

I unreservedly concur in Judge Quattlebaum's excellent opinion, which correctly disposes of the issues presented here.  I write separately to emphasize a salient point:  a legal precedent's vitality is not determined solely by its age.  Put most simply, even "old law" — here, our 1971 decision in *Nell v. United States*, 450 F.2d 1090 (4th Cir. 1971) — can be good law.

More than 50 years later, the principles enunciated in *Nell* not only remain controlling, they make good sense.  Writing for our Court, Chief Judge Haynsworth explained that, in connection with lawyer sanctions, "[d]ue process . . . requires that [such] proceedings be preceded by adequate notice and an opportunity to prepare a defense." *See Nell*, 450 F.2d at 1093.  Those venerable principles constitute the heart of "due process" in our American legal system.

Against this backdrop, my friend Judge Quattlebaum's opinion aptly recognizes that the *Nell* principles are applicable in situations like this.  Surprisingly, in all the proceedings underlying this appeal, the *Nell* decision was relegated to obscurity — neither the lawyers nor the courts acknowledged its existence.[*]  By Judge Quattlebaum's opinion, we correct that oversight.  Perhaps this correction can serve as an important reminder:  decades-old precedent can be pertinent and controlling.

With great respect, I am honored to concur.

---

[*] The *Nell* decision was not mentioned in the lower courts or in the appellate briefs. It was, however, pointed out to the appellate lawyers by our panel prior to oral argument.